

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
———————————————————————————————

UNITED STATES OF AMERICA,

v.

MARCELLUS GIBSON,

_____Defendant._____

**REPORT AND**
**RECOMMENDATION**
13-CR-6156-CJS-JWF

### Background

Defendant Marcellus Gibson ("the defendant" or "Gibson")
filed his omnibus motions on November 17, 2016, seeking, inter
alia, (1) suppression of evidence, which the defendant claimed was
the fruit of an illegal search under the Fourth Amendment and (2)
suppression of the defendant's post-arrest statements, which he
claimed were made in violation of his Fifth and Sixth Amendment
rights. Def.'s Mot. (Docket # 53), at 6. The government responded
to the defendant's motion on December 1, 2016. See Docket # 54.

The Court held evidentiary hearings and arguments on April 4,
2017 (see Docket ## 67, 69), June 2, 2017 (see Docket ## 74, 79)
and June 9, 2017 (see Docket ## 78, 80). Drug Enforcement Agency
("DEA") Special Agent Sabatino Smith ("Agent Smith"), Rochester
Police Department Investigator Timothy Pearce ("Inv. Pearce"),
Gibson himself and United States Probation Officer Cathy Buckert
("Officer Buckert") testified. After a delay requested by the
parties to pursue  plea negotiations expired without agreement,

the government filed its post-hearing brief on September 1, 2017. See Docket # 85. The defendant filed his post-hearing brief on October 2, 2017. See Docket # 89.

For the reasons that follow, it is my Report and Recommendation that the defendant's motion to suppress (see Docket # 53) be **denied**.

## Findings of Fact

A. Agent Smith, Inv. Pearce, Officer Buckert: Agent Smith testified that in August and September 2013, he and Inv. Pearce were involved in a cocaine trafficking investigation, the target of which was Gibson. Transcript of April 17, 2017 Hearing, Docket # 69 ("Tr. 1"), at 16-17.

On August 8, 2013, law enforcement made a controlled buy of cocaine from the defendant. Id. at 17-18. During the course of the investigation Agent Smith learned that Gibson had been previously convicted in federal court of distribution of cocaine and was currently on supervised release. Id. at 19-21. In the defendant's conditions of supervised release, he agreed to "submit to a search of his person, property, vehicle, place of residence or any other property under his control based on reasonable suspicion and permit confiscation of any evidence or contraband discovered." Judgment, Docket # 36, at 4, United States v. Gibson, No. 10-cr-6142 (W.D.N.Y. Nov. 28, 2011).

At some point after the controlled purchase, but before obtaining a criminal complaint against Gibson, Agent Smith notified the United States Probation Office ("probation") that the DEA had made a controlled purchase of cocaine from the defendant. Tr. 1, at 22.   In addition to this information from law enforcement, probation also had received information from one or more confidential informants that the defendant was engaged in the sale of drugs.   Transcript of June 2, 2017 and June 9, 2017 Hearings, Docket ## 79, 80 (collectively, "Tr. 2"), at 34.   Agent Smith learned that probation planned on searching the defendant's residence on September 26, 2013 based on this information.[1]   Tr. 1, at 23.   Officer Buckert testified that probation, not the DEA, made the decision to conduct the search and it was authorized by the search condition required by Gibson's terms of supervised release.   Tr. 2, at 42.   Similarly, Agent Smith testified that it was probation who raised the idea of searching Gibson's residence. Tr. 1, at 25-26.

Sometime before September 26, the day of the search, probation asked Agent Smith if he wanted to be present for the search.   Agent Smith indicated that he did.   Tr. 1, at 23.   Officer Buckert testified that she was not sure if Agent Smith or Inv. Pearce were present for the planning of the search, but it would not be unusual

---

[1] It is unclear whether probation reached out to Agent Smith or if Agent Smith reached out to probation about conducting the search.   Id. at 23.

to involve non-probation staff in such planning.  Tr. 2, at 37. After learning that probation was going to conduct a search, Agent Smith obtained the criminal complaint and arrest warrant so that Gibson could be taken into custody in conjunction with probation's search of Gibson's residence.  Tr. 1, at 17-18, 25.

On the morning of September 26, 2013, Agent Smith and Inv. Pearce arrived at the defendant's residence, 445 Post Avenue, Apartment 4, Rochester, New York.  Id. at 26.  Agent Smith and Inv. Pearce sat in their vehicle while probation officers made entry into the residence.  When Agent Smith and Inv. Pearce entered the residence, probation officers had already handcuffed the defendant.  Id. at 27.  Neither Inv. Pearce nor Agent Smith actively participated in any search of the residence.  Id.  Gibson knew Inv. Pearce from a previous case, and told Inv. Pearce that he "wanted to talk."  Id. at 28.  Inv. Pearce and Agent Smith advised Gibson that they would speak with him after he was transported to DEA's offices in the Federal Building.  Id. at 28, 64.  At this point, the defendant was not given any Miranda warnings.

Gibson was transported to the DEA offices in Rochester.  Id. at 29.  While being transported, the defendant reiterated that he "wanted to work," but Inv. Pearce and Agent Smith told the defendant they would speak to him once they arrived at the office. Id. at 45.  Upon arrival at the DEA office, Gibson was placed in

4

an interview room. Agent Smith and Inv. Pearce began to interview the defendant at 9:22 a.m. Id. at 29. Gibson was not handcuffed. Id. at 45. After introducing himself and Inv. Pearce (who the defendant already knew from his work as a confidential informant), and prior to questioning the defendant, Agent Smith advised the defendant of his Miranda rights using a standard rights form. Id. at 30. Gibson stated that he understood his rights and was willing to answer questions. Id. at 32-33. After the defendant was read his rights, but still early in the interview, Gibson mentioned his previous cooperation with Inv. Pearce and indicated that he wanted to cooperate. Agent Smith and Inv. Pearce told the defendant "that's not what we're about at this time" and that they would take all the information Gibson might provide to a prosecutor for a decision on cooperation at a later time. Id. at 40-42. Inv. Pearce testified that Gibson's previous cooperation agreement concluded in 2011 and that Gibson would have known that his cooperation had terminated. Id. at 64, 75.

The interview lasted approximately one hour, after which Gibson's statements were memorialized in a written statement, which the defendant signed after making several changes. Id. at 33-35. Agent Smith testified that neither he nor Inv. Pearce ever made any threats or promises to the defendant. Id. at 39. Inv. Pearce testified that during the interview neither he nor Agent Smith ever discussed with Gibson to Gibson because he was giving

5

a statement to law enforcement. Id. at 67. Both Agent Smith and Inv. Pearce repeatedly told the defendant that they did not have any authority to determine cooperation and could not make any promises. Id. at 71. Both Agent Smith and Inv. Pearce denied Gibson's accusation that they told the defendant that his attorney need not be present during the interview or that they were interviewing him solely to determine whether Gibson would be "qualified as an informant." Id. at 56, 66, 73.[2]

B. Marcellus Gibson:    The defendant testified on his own behalf at the suppression hearing.   According to Gibson, on the morning of September 26, 2013, five to seven probation officers appeared at his door.  Id. at 91.  After opening the door, Gibson testified that Officer Buckert told him that she had a warrant for his arrest.   Gibson testified that he was immediately handcuffed, and then "everybody just started searching the apartment." Id. at 91.   Gibson recalled that Agent Smith and Inv. Pearce entered the residence about five minutes after the probation officers had entered his residence.  Id. at 91-92.  According to Gibson, Agent Smith or Inv. Pearce advised him of his Miranda rights while he

---

[2] In support of his motion, the defendant submitted a declaration in which he stated that (1) he was not read his rights immediately prior to his interrogation; (2) "before the questioning even began . . . I asked both agents shouldn't my attorney be with me to help and protect me in this interview, and both of them responded by telling me it was not necessary for me to have my attorney there because they were only interviewing me to see if . . . I qualified as an informant" and (3) "[t]he government and I agreed to be an informant because I was led to believe this was the only way around it." Docket # 53, at 28-29.

was still at his residence. Id. at 102. During his ride to the
federal building, Gibson claims that Agent Smith and Inv. Pearce
told him that "the only way to help myself was to help them." Id.
at 93. According to the defendant, Agent Smith and Inv. Pearce
"initiated" the conversation regarding his cooperating with law
enforcement. Id.

After being seated in the DEA interview room, Gibson recalls
being un-cuffed by the agents. He testified that he was then asked
"would I be willing to cooperate? I told them I definitely would
be willing to cooperate if it's going to help me in my situation."
Id. at 95. Gibson stated that before any further questions were
asked, he turned to Inv. Pearce and Agent Smith and asked:

shouldn't I have an attorney here to help me, to protect
me with anything that might go wrong or - and both the
agents basically told me no, because what we're doing
here right now is just obtaining information from you to
see if you have enough information to give us to convince
the government to let you cooperate because we won't
have the final say so.

Id. at 95. According to the defendant, Agent Smith and Inv. Pearce
responded that an attorney was not necessary because the interview
was simply intended to determine if the defendant could qualify as
an informant. Id. at 114.

During his testimony, Gibson conceded that he did not "tell
them I want an attorney." Id. at 113. Gibson stated he understood
that the information he provided would be taken to the government
"to see if he would agree to allow me to assist the agents as a

7

cooperating witness for the government." Id. at 96.  The defendant
testified that he agreed to speak because he believed it would
help his situation and because he had previously cooperated with
Inv. Pearce.   Id. According to Gibson, he asked about being
provided with an attorney at least two times before the interview
began.   Id.  But he did not believe that the information he was
giving was "for something to be legally charged"; rather, he
believed the information would allow the government to "agree to
me becoming an informant."  Id. at 97.  Gibson agreed that he was
advised that he was being charged with narcotics trafficking, but
stated that the scope of his interview went beyond those charges
because Agent Smith and Inv. Pearce had told him "in order to help
myself with this charge, I have to give them information to take
to the U.S. Attorney."  Id. at 99.  Gibson agreed that he did not
feel threatened or coerced to make his post-arrest statements to
law enforcement.   Id. at 102.   At the end of the interview, a
written statement was prepared and Gibson initialed and signed the
statement.   Id. at 98.

## Discussion

Gibson's motion papers make three suppression arguments: (1)
the search of his residence violated the Fourth Amendment; (2) the
post-arrest statement he made to the agents violated his Miranda
rights and (3) during his post-arrest interview at the DEA office

8

he invoked his Fifth Amendment right to counsel. Each argument is addressed below.

Fourth Amendment Violation: Gibson contends that the search of his apartment by federal probation officers should be suppressed as an unreasonable search under the Fourth Amendment. He argues that first, there was no evidence to justify probation's search and second, probation's coordination with law enforcement rendered the subsequent search unreasonable. Neither argument is persuasive based on the facts adduced at the suppression hearing.

As to the justification for the search of his residence, it is well-settled that "[a] parolee's reasonable expectations of privacy are less than those of ordinary citizens . . . and are even less so where, as here, the parolee, as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer." United States v. Massey, 461 F.3d 177, 179 (2d Cir. 2006). As a specific condition of Gibson's supervised release, federal probation officers were entitled to search his residence upon "reasonable suspicion" of illegal activity. There was ample reasonable suspicion here. Officer Buckert testified that probation had received reliable information that the defendant was engaging in drug trafficking. One of the sources of this information was the DEA who told probation "that a controlled purchase of cocaine from Marcellus Gibson had occurred." Tr. 1, at 22. There simply is no merit to

Gibson's argument that probation had insufficient justification to search the defendant's residence pursuant to the search condition of his supervised release. See United States v. Townsend, 371 F. App'x 122, 125 (2d Cir. 2010) ("Mercado's probation officer received specific information from law enforcement officials working on an ongoing investigation that suggested contraband might be found in Mercado's home. The search did not violate Mercado's Fourth Amendment rights, and his suppression motion was properly denied."); United States v. Chirino, 483 F.3d 141, 148 (2d Cir. 2007) (finding probation search was based on reasonable suspicion when probation officers were aware of defendant's prior gang affiliation and had received a tip from an informant); United States v. Chandler, 164 F. Supp. 3d 368, 379 (E.D.N.Y. 2016) ("[C]ourts have routinely found specific information received by probation officers from confidential informants and eyewitnesses provides reasonable suspicion to justify a search."). The defendant has not articulated how this information fails to establish reasonable suspicion sufficient to justify probation's search nor has he put forth any serious argument that the search was too broad given the facts underlying the search.

Alternatively, the defendant argues that probation's coordination with law enforcement in executing the search rendered the search unreasonable. In making this argument, the defendant invokes the so called "stalking horse" theory "pursuant to which

a probation officer may not use his authority to conduct a home

visit to help law enforcement evade the Fourth Amendment[] . . .

."  United States v. Reyes, 283 F.3d 446, 462 (2002).  This

contention is also without merit.  First, it is clear that the

Second Circuit does not recognize the "stalking horse" theory.

Id. at 463 ("[T]he doctrine is not a valid defense in this

circuit."); United States v. Newton, 369 F.3d 659, 667 (2d Cir.

2004) ("[W]e reiterate Reyes's rejection of stalking horse

challenges.").  "[T]he duties and objectives of probation/parole

officers and other law enforcement officials, although distinct,

may frequently be 'intertwined' and responsibly require concerted

efforts."  Newton, 369 F.3d at 667 (quoting Reyes, 283 F.3d at

463-64).  This was such a case.  Probation received information

from the DEA that Gibson, who was under federal probation

supervision, was actively engaging in narcotics trafficking.  It

was certainly within the scope of Officer Buckert's - and other

probation officers' - duties to investigate a potential violation

of supervised release and prevent any future violations by the

defendant.  See Newton, 369 F.3d at 666 (finding that once parole

officer had information that defendant possessed a gun at his

residence and used it to threaten others, officer was entitled to

search defendant's apartment).  In conducting the search,

probation officers were pursuing legitimate supervised release

objectives.  The fact that probation allowed DEA agents to be at

the residence during the search so that they could execute a judicially obtained arrest warrant for Gibson does not transform the search into a violation of the Fourth Amendment. "[T]he law permits cooperation between probation officers and other law enforcement officials so that they may work together and share information to achieve their objectives." Reyes, 283 F.3d at 471.

Gibson's Miranda Rights:  The defendant does not dispute he was read his Miranda rights[3] or agreed to speak to Agent Smith and Inv. Pearce.  His argument is essentially that he was tricked into making a statement because he was told "that the information provided was to assess whether he would be considered for a cooperation agreement."  See Def.'s Post-Hearing Br. (Docket # 89), at 7.  Defense counsel argues that it "would be foolish for Gibson to give any statements to the police if he believed those statements were to be used to incriminate himself, rather than to assess his viability as a cooperating witness."  Id.

Neither the hearing testimony nor the law support the defendant's argument that he was wrongfully induced into speaking to law enforcement after his arrest.  First, the hearing testimony confirms that once Gibson was arrested on the federal drug charges,

---

[3] The hearing testimony revealed a difference of opinion over where the defendant was advised of his Miranda rights.  The defendant contends that he was advised of his Miranda rights at his residence, while Agent Smith and Inv. Pearce assert that the defendant was advised of his Miranda rights at the DEA offices.  For purposes of this Report and Recommendation, it does not matter where Gibson was informed of his rights because the defendant concedes that he was fully advised of those rights at some point prior to speaking to Agent Smith and Inv. Pearce.

he expressed interest in cooperating with the government as a way to reduce or eliminate his criminal liability. Agent Smith and Inv. Pearce testified that Gibson first broached the topic of "working" with law enforcement. Gibson testified that the agents brought up the topic of cooperation first and he "told them I definitely would be willing to cooperate if it's going to help me in my situation." Tr. 1, at 96. Gibson stated "I agreed [to speak to law enforcement] because I honestly believed that assisting them would help me with my situation." Id. at 95-96. Gibson concedes that when he was advised of his Miranda rights at his home he understood that anything he told the police could be used against him, id. at 104, but when the agents interviewed him at the federal building, he "was under the impression" that if he gave a statement in order to convince law enforcement that he had value as an informant, the information he provided would not be used against him. Id. at 106-07.

Gibson's belief that, in light of his arrest, providing information to Inv. Pearce and Agent Smith about narcotics trafficking would be the only way to propel a federal prosecutor to provide him favorable treatment was entirely credible. But such a subjective belief, no matter how reasonable, does not, without more, operate to immunize the statements made to law enforcement. "There is, of course, nothing improper about the government seeking the cooperation of an arrestee. Such overtures

13

further legitimate law enforcement interests. Absent improper police conduct, the fruits of those cooperation efforts are properly admitted against a defendant." United States v. Fronk, 173 F.R.D. 59, 68 (W.D.N.Y. 1997) (finding that discussions about cooperation with a defendant involving defense counsel on the evening of arrest constitute inadmissible plea bargaining discussions pursuant to Federal Rule of Criminal Procedure Rule 11(f)).

Here, I find credible Agent Smith and Inv. Pearce's testimony that no promises were made to Gibson in return for his cooperation, save for the promise to take the information to the prosecuting attorney for a decision on whether the government had any interest in using the information provided by Gibson. Tr. 1, at 41. Such a representation was not improper. Indeed, "it is well established that promises of leniency, without more, do not render a confession involuntary." United States v. Romano, 630 F. App'x 56, 58 (2d Cir. 2015), cert. denied, 136 S. Ct. 2041 (2016). Statements by law enforcement indicating that it would be in the defendant's best interest to cooperate do not render a waiver involuntary or coerced. See United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) ("[S]tatements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive."). Compare United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir. 1974) ("No specific promises were made to [defendant]. He was simply informed

14

that it would be to his benefit to cooperate.  Such statements by law enforcement officials have not been considered overbearing."), with United States v. Haak, 215 F. Supp. 3d 218, 229 (W.D.N.Y. 2016) (Villardo, J.) (suppressing statements where law enforcement made implicit and false promises that defendant could avoid prosecution by cooperating).  Moreover, Miranda warnings are not inconsistent with law enforcement telling a suspect that speaking with or helping the police may help him:

> An indication by the arresting officers to the defendant that his cooperation will help him is only one factor to consider in determining whether the defendant's waiver was given voluntarily. There is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him. Both are true.

United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).  For these reasons, Agent Smith and Inv. Pearce's comments that the defendant's statements would be taken to the prosecutor for a determination on cooperation do not render the defendant's waiver involuntary and subject to suppression.

Fifth Amendment Right to Counsel:  Gibson claims that he requested counsel during his post-arrest interview and Agent Smith and Inv. Pearce did not honor his request.  It is well-settled that if Gibson waived his right to counsel after receiving his Miranda warnings, law enforcement officers were free to question him.  If, however, Gibson requested counsel at any time during the interview, he should not have been subjected to further questioning

15

until a lawyer was made available or Gibson himself reinitiates conversation. See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Based on the evidence adduced at the hearing, I conclude that the defendant never invoked his Fifth Amendment Right to counsel.

The invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be constructed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Davis v. United States, 512 U.S. 452, 459 (1994). Instead, "the suspect must unambiguously request counsel." Id. at 459, 462 (holding that the "[m]aybe I should talk to a lawyer" remark made by the petitioner "was not a request for counsel"); see also Diaz v. Senkowski, 76 F.3d 61, 63, 65 (2d Cir. 1996) (finding that defendant "did not effectively assert his right to counsel" when defendant stated "I think I want a lawyer" and "[d]o you think I need a lawyer?" to the police). The Supreme Court has specifically rejected requiring police "questioning to cease if a suspect makes a statement that might be a request for an attorney." Davis, 512 U.S. at 461.

16

When analyzed under these well-established Fifth Amendment principles, it is clear that Gibson's Fifth Amendment right to counsel was never violated because he never invoked it.  Gibson conceded that "I didn't tell them I want an attorney."  Tr. 1, at 113.  Instead, he testified that he asked at least two times before the interview began, "if I do agree to cooperate, shouldn't I have an attorney to here to help me" (id. at 95) and "should my attorney be here with me?" (id. at 113).  These statements, if made, were not sufficiently and unequivocally clear enough that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney.  See Davis, 512 U.S. at 459.  Gibson never said that he wanted a lawyer, that he wanted the agents to get him a lawyer or that he no longer wished to speak to the agents without a lawyer.  As a result, I find that Gibson did not sufficiently and unambiguously invoke his right to counsel.  See Bush v. Kirkpatrick, No. 06-CV-0771T, 2010 WL 415288, at *4 (W.D.N.Y. Jan. 28, 2010) ("An ambiguous or equivocal reference to an attorney that would cause a reasonable officer only to suspect that the defendant might be invoking the right to counsel does not require the cessation of questioning.").  Accordingly, it is my Report and Recommendation that the defendant's motion to suppress statements be **denied**.

17

## Conclusion

For the reasons stated above, it is my Report and Recommendation that the defendant's motion to suppress (Docket # 53) be **denied**.

**SO ORDERED**.

JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated:   Rochester, New York
         December 1, 2017

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   December 1, 2017
         Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).